## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 3:18cv367** |
| | : | |
| **v.** | : | |
| | : | |
| **$3,579.81 FROM FIFTH THIRD BANK** | : | |
| **ACCOUNT NUMBER XXXXXX0916,** | : | |
| **HELD IN THE NAME OF HAYA LLC,** | : | |
| **DAYTON PHARMACY,** | : | **VERIFIED COMPLAINT FOR** |
| | : | **FORFEITURE IN REM** |
| **Defendant 1,** | : | |
| | : | |
| **and** | : | |
| | : | |
| **$3,976.61 FROM PNC BANK CHECKING** | : | |
| **ACCOUNT NUMBER XXXXXX3064,** | : | |
| **HELD IN THE NAME OF BROWN M D** | : | |
| **& ASSOCIATES LLC,** | : | |
| | : | |
| **Defendant 2.** | : | |
| | : | |

Plaintiff, United States of America, by its undersigned counsel, alleges the following for its action against the defendants in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure.

## NATURE OF THE ACTION

1.      This is a civil action *in rem* brought to enforce 21 U.S.C. § 881(a)(6), which provides for the forfeiture to the United States of:

> All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter;

and/or 18 U.S.C. § 981(a)(1)(A), which provides for the forfeiture to the United States of:

> Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property.

## THE DEFENDANTS IN REM

2.      Defendant 1 is $3,579.81 from Fifth Third Bank Account Number xxxxxx0916, held in the name of Haya LLC, Dayton Pharmacy.   On or about November 6, 2018, the Drug Enforcement Administration seized Defendant 1 while executing a federal seizure warrant (Case No. 2:18-mj-819).  Defendant 1 will be deposited into the Seized Asset Deposit Fund, where it will remain during the pendency of this action.

3.      Defendant 2 is $3,976.61 from PNC Bank Checking Account Number xxxxxx3064, held in the name of Brown M D & Associates LLC.   On or about November 6, 2018, the Drug Enforcement Administration seized Defendant 2 while executing a federal seizure warrant (Case No. 2:18-mj-820).  Defendant 2 will be deposited into the Seized Asset Deposit Fund, where it will remain during the pendency of this action.

## JURISDICTION AND VENUE

4.      Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendants pursuant to 21 U.S.C. § 881(a)(6) and/or 18 U.S.C. § 981(a)(1)(A).   This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345 and over an action for forfeiture under 28 U.S.C. § 1355(a).

5.      This Court has *in rem* jurisdiction over the defendants pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture occurred in the Southern District of Ohio.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts

2

and omissions giving rise to the forfeiture occurred in the Southern District of Ohio and pursuant to 28 U.S.C. § 1395 because the defendants were found in the Southern District of Ohio.

## BASES FOR FORFEITURE

7.    The defendants are subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because the defendants represent property furnished or intended to be furnished in exchange for a controlled substance, represent proceeds traceable to such an exchange, or were used or intended to be used to facilitate any violation of 21 U.S.C. § 841 or a conspiracy to commit such offense, in violation of 21 U.S.C. § 846.

8.    The defendants are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in or traceable to property involved in money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

9.    To the extent that it is necessary to do so, the United States intends to rely on the provisions of 18 U.S.C. § 984 to establish that the defendants are subject to forfeiture.

## FACTS

10.    The attached Declaration (Exhibit 1), including but not limited to paragraphs 1 through 48, is hereby incorporated by reference and made a part of this Complaint and sets forth the facts in support of the United States' allegation that the defendants are forfeitable under 21 U.S.C. § 881(a)(6) and/or 18 U.S.C. § 981(a)(1)(A).

## CLAIM FOR RELIEF

WHEREFORE, the plaintiff respectfully requests that:

(a)    the Court find there is probable cause to believe that the defendants have been forfeited to the United States pursuant to 21 U.S.C. § 881(a)(6) and/or 18 U.S.C. § 981(a)(1)(A);

3

(b)     pursuant to Rule G(3)(b)(i), Supplemental Rules, the Court issue a warrant of arrest *in rem*, directing the United States to arrest and seize the defendants and to retain the same in its custody subject to further order of the Court;

(c)     the Court, pursuant to Rule G(4), Supplemental Rules, direct the United States to give notice to all persons and entities having an interest in the defendants to assert in conformity with the law a statement of any interest they may have, including notice by publication on the official government website, www.forfeiture.gov, for thirty consecutive days;

(d)     the forfeiture of the defendants to the United States be confirmed, enforced, and ordered by the Court;

(e)     the Court thereafter order the United States to dispose of the defendants as provided by law; and

(f)     the Court award the United States all other relief to which it is entitled, including the costs of this action.

Respectfully submitted,

BENJAMIN C. GLASSMAN
United States Attorney

s/Deborah D. Grimes
DEBORAH D. GRIMES (0078698)
Assistant United States Attorney
Attorney for Plaintiff
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
(513) 684-3711 / Fax: (513) 684-6385
Deborah.Grimes @usdoj.gov

<u>VERIFICATION</u>

I, Michael P. Flynn, hereby verify and declare under the penalty of perjury that I am a Special Agent of the Drug Enforcement Administration, that I have read the foregoing Verified Complaint for Forfeiture *in rem* and know the contents thereof, and that the matters contained in the Complaint are true to my own knowledge, except those matters stated to be alleged on information and belief and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, and my investigation of this case.

I hereby verify and declare under the penalty of perjury that the foregoing is true and correct.

Dated _11-6-18_

MICHAEL P. FLYNN, Special Agent
Drug Enforcement Administration

5

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| United States of America | $3,579.81 from Fifth Third Bank Account Number xxxxxx0916, Held in the Name of Haya LLC, Dayton Pharmacy, et al. |

**(b)** County of Residence of First Listed Plaintiff    Montgomery
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Montgomery
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Deborah D. Grimes, Assistant United States Attorney
221 E. Fourth Street, Suite 400
Cincinnati, Ohio 45202    (513) 684-3711

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1   U.S. Government
Plaintiff

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 2   U.S. Government
Defendant

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*      *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☒ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | ☐ 367 Health Care/ Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| (Excludes Veterans) | ☐ 345 Marine Product Liability | Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | Injury | ☐ 380 Other Personal Property Damage | Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 751 Family and Medical Leave Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Forfeiture pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(A)
Brief description of cause:
Forfeiture

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions:)*
JUDGE          DOCKET NUMBER

DATE    11/6/18
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

**EXHIBIT 1**

**DECLARATION OF MICHAEL P. FLYNN**

1.      I am a Special Agent of the Drug Enforcement Administration ("DEA") and am assigned to pursue a federal criminal investigation of Morris BROWN, Alison BROWN, Ismail M. ABUHANIEH, Mahmoud ELMIARI, Mahmoud RIFAI, and businesses owned or operated by said individuals.

2.      I am assigned to the Detroit Field Division, Columbus District Office.  As such, I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516(1).  I have been a Special Agent of the DEA since December 1999, during which time I have participated in numerous investigations involving narcotics trafficking.  I have received specialized training in the subjects of narcotics trafficking and money laundering from the DEA and personally have been involved in investigations concerning the possession, manufacture, transportation, distribution, and importation of controlled substances, as well as methods used to finance drug transactions.

3.      I have investigated and assisted with the investigation of individuals and organizations that illegally distribute or dispense controlled substances under the guise of operating seemingly legitimate medical clinics (colloquially known as "pill mills").  These "pill mills" operate as pain management clinics, emergency care or "urgent care" clinics, or other similarly characterized clinics.  Typically, an individual who seeks to abuse or illegally divert controlled substances will go to one of these medical clinics.  The physician at the medical clinic issues a prescription for a controlled substance, often without performing the minimal professionally required medical assessment of the patient's complaints or properly evaluating

whether prescribing the controlled substances is medically appropriate.

4.     Based on my training and experience, signs that physicians at a medical clinic are issuing prescriptions for controlled substances outside the course of professional practice and without a legitimate medical purpose may include, but are not limited to, the following:

a.     Cash-only business;

b.     No insurance accepted;

c.     Patients travel long distances (from out-of-county or out-of-state);

d.     Patients line up for "appointments" hours in advance;

e.     "Appointments" are not for a specific time;

f.     Patients travel in groups;

g.     High volume of patients going through the clinic;

h.     Cursory physical examination or no physical examination during initial and follow-up visits;

i.     Brief initial and follow-up visits;

j.     Doctor does not undertake an independent evaluation of patient (*i.e.*, patient suggests or directs the medication to be prescribed);

k.     Doctor writes out prescriptions for controlled substances and places them in the patient's file prior to the patient's visit;

l.     Failing to treat patients with anything other than controlled substances;

m.     Failing to heed warnings by others that drug-seeking persons are trying to obtain controlled substances from the doctor;

n.     Patients who appear and behave in a manner consistent with abusing, or being addicted to, controlled substances;

o.     Patients who engage in drug deals on clinic property or openly discuss diverting their prescriptions;

p.     Directing patients to particular pharmacies to fill their prescriptions;

2

q.  Pharmacies have stopped filling the physician's prescriptions due to suspicious activity or high number of controlled substance prescriptions; and

r.  Clinic owners/operators and employees are hyper-aware of law enforcement.

5.  The facts and information contained in this declaration are personally known to me based on my training, knowledge, and investigative activities or that of other special agents, task force officers, or other law enforcement personnel involved in, or related to this investigation, which has been relayed to me. Because this declaration is being submitted for the limited purpose of establishing probable cause to support the Complaint for Forfeiture *in rem*, I have not included each and every fact known to me concerning this investigation or identified all potential criminal charges applicable to this case. I have set forth only the facts that I believe are necessary to support the forfeiture.

## OVERVIEW

6.  Evidence gathered to date in this investigation indicates that from on or about June 12, 2012, through in or about November 2017, Dr. Morris BROWN, who owned, operated, and practiced medicine at DAYTON PRIMARY & URGENT CARE CENTER, d/b/a PRIMARY CARE DAYTON, located at 301 W. 1st Street, Dayton Ohio 45402, aided and abetted by or conspired with, his wife Alison BROWN, and the DAYTON PHARMACY and its owners and/or operators including, but not limited to, Ismail ABUHANIEH, Mahmoud RIFAI, and Mahmoud ELMIARI, illegally distributed and/or dispensed controlled substances under the guise of operating a seemingly legitimate medical clinic. In addition, Dr. Morris BROWN, Alison BROWN, and the DAYTON PHARMACY, including its owners and/or operators, conducted, or caused to be conducted, financial transactions involving the proceeds of those activities with the intent to promote the carrying on of specified unlawful activity.

3

**PROPERTY SUBJECT TO FORFEITURE**

7.      I make this declaration to support the forfeiture of the following property (the "subject property"):

   a.      $3,579.81 from Fifth Third Bank Account Number xxxxxx0916, held in the name of HAYA LLC, DAYTON PHARMACY (Defendant 1); and

   b.      $3,976.61 from PNC Bank Checking Account Number xxxxx3064, held in the name of BROWN M D & ASSOCIATES LLC (Defendant 2).

8.      The subject property is forfeitable under:

   a.      21 U.S.C. § 881(a)(6) as property furnished or intended to be furnished in exchange for a controlled substance, proceeds traceable to such an exchange, and property used or intended to be used to facilitate one or more violations of 21 U.S.C. §§ 841, 846, and 856; and

   b.      18 U.S.C. § 981(a)(1)(A) as property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956, or property traceable to such property.

9.      Legitimate transactions involving pharmaceutical controlled substances take place within a "closed system" of distribution established by Congress. Under this "closed system," Title 21 requires that all legitimate handlers of controlled substances, such as manufacturers, distributors, physicians, pharmacies, and researchers, must be registered with DEA and maintain strict accounting for all distributions. Registrants can be prosecuted under 21 U.S.C. § 841 when their activities fall outside the bounds of professional medical practice and are not for a legitimate medical purpose.

10.      I am advised that 18 U.S.C. § 984 is a fungible asset provision and provides that it is not necessary, in a civil forfeiture action in which the subject property is funds deposited in an account in a financial institution, for the Government to identify the specific property involved in the offense that is the basis of forfeiture and that it is not a defense that the property involved in such an offense has been removed and replaced by identical property. In addition, any identical

4

property found in the same account as the property involved in the offense that is the basis for the forfeiture is subject to forfeiture as long as the forfeiture is commenced no more than one year from the date of the offense.

## BACKGROUND

11.     In 2015, the Columbus Ohio DEA-Tactical Diversion Squad, the State Medical Board of Ohio, and other agencies initiated an investigation into a "pill-mill" organization that operated in Ohio, Arizona, and Michigan.  Between approximately June 12, 2012, and November 2017, members of this organization conspired to possess with intent to distribute and dispense millions of dosage units of controlled substances, in particular, opioids.  During that period, Dr. Morris BROWN, the head of the organization in Dayton, Ohio, "funneled" patients from his medical practice named DAYTON PRIMARY & URGENT CARE CENTER, d/b/a PRIMARY CARE DAYTON to the DAYTON PHARMACY in order to fill prescriptions.

12.     Beginning in June 2012, and continuing through in or about at least November 2017, owners of the DAYTON PHARMACY illegally obtained controlled substances/opioids from wholesale distributors based on fraud and deception by falsifying certain documents, and then ultimately sold, disbursed, and dispensed the opioids.  A review of bank records shows that the DAYTON PHARMACY deposited millions of dollars in proceeds from the sale of these controlled substances/opioids into Fifth Third Bank Account Number xxxxxx0916, held in the name of HAYA LLC, DAYTON PHARMACY.

13.     The DAYTON PHARMACY then disbursed these proceeds of specified unlawful activity on expenditures to include, but not limited to, "rent" paid to BROWN M D & ASSOCIATES LLC at an inflated rate and deposited into PNC Bank Checking Account Number xxxxxx3064, held in the name of BROWN M D & ASSOCIATES LLC.

14.     Dr. Morris BROWN and his wife Alison BROWN owned and operated BROWN M D & ASSOCIATES LLC, in a building that occupied both Dr. BROWN's medical practice, PRIMARY CARE DAYTON, and the DAYTON PHARMACY.  Dr. BROWN re-invested these illegal proceeds back into the businesses, that were used to facilitate the illegal activities, by making disbursements from the BROWN M D & ASSOCIATES LLC PNC bank account to pay the mortgage and real estate taxes for the property that houses his medical practice and the DAYTON PHARMACY.

15.     The DAYTON PHARMACY is owned by HAYA, LLC.  HAYA, LLC is owned by Ismail M. ABUHANIEH who resides in Ohio and Arizona.

16.     On November 7, 2017, federal search warrants were executed at PRIMARY CARE DAYTON and the DAYTON PHARMACY, both located at 301 W. 1st Street, Dayton, Ohio, that resulted in the seizure of patient files, filled prescriptions, a shotgun, and controlled substances such as opioids.

## FACTS SUPPORTING PROBABLE CAUSE

17.     On January 28, 2015, the Columbus DEA Tactical Diversion Squad met with investigators from several law enforcement and regulatory boards, including the State Medical Board of Ohio.  The meeting was to discuss information obtained on Dr. Morris BROWN M.D., who owned and operated DAYTON PRIMARY & URGENT CARE CENTER, d/b/a PRIMARY CARE DAYTON, located at 301 W. 1st Street, Suite 100, Dayton, Ohio 45402.  Dr. BROWN operated as a general practitioner and DATA Waived physician[1].  BROWN's wife, Alison

---

[1] The Drug Addiction Treatment Act ("DATA") permits qualified physicians to treat narcotic dependence with Schedules III-V narcotic controlled substances that have been approved by the FDA.  The legislation waives the requirement for obtaining a separate DEA registration as a Narcotic Treatment Program for qualified physicians administering, dispensing, and prescribing the specific FDA approved controlled substances.

BROWN, worked in the practice as the office manager. Dr. BROWN was a strong opponent of State of Ohio House Bill 93, an Ohio law that requires physicians to go through additional training and register as a pain clinic if more than 50% of patients are being treated for pain. Dr. BROWN refused to obtain a pain clinic license despite having more than 50% of his patients being managed for pain through the use of narcotic pain relievers. Several known patients of Dr. BROWN died of drug overdoses or heart attacks while under his care. The majority of Dr. BROWN's prescriptions were filled at the DAYTON PHARMACY, located in the lobby of Dr. BROWN's medical practice.

18.     The Ohio Automated Rx Reporting System ("OARRS") was established in 2006, and is a web-based system that collects information on all outpatient prescriptions for controlled substances that are dispensed by Ohio licensed pharmacies and prescribed or personally furnished by licensed prescribers in Ohio. The information in OARRS is available to prescribers (or their delegates) when they treat patients, pharmacists (or their delegates) when presented with prescriptions from patients, and law enforcement officers and health care regulatory boards during active investigations.

19.     Beginning on April 1, 2015, Ohio law established several new requirements for Ohio prescribers related to OARRS.

    a.     Before initially prescribing or personally furnishing an opioid analgesic or a Benzodiazepine to a patient, the prescriber must request patient information from OARRS that covers at least the previous 12 months.

    b.     The prescriber also must make periodic requests for patient information from OARRS if the course of treatment continues for more than ninety days. The requests must be made at intervals not exceeding ninety days, determined according to the date the initial request was made.

    c.     Under the circumstances described above, the prescriber is required to assess the OARRS information and document in the patient record that a patient prescription history report was received and assessed.

7

20.     During 2010, investigators from the State Medical Board of Ohio received a complaint on Dr. BROWN from a pharmacist ("CS-1") who stated that Dr. BROWN had questionable prescribing practices and that many of his patients got the drugs they want and not necessarily the drugs they need. CS-1 called Dr. BROWN to discuss the matter and was told to "just shut up and fill the prescriptions." Investigators obtained an OARRS report and found several patients who were receiving suspicious prescriptions including large doses of opioid pain medications, overlapping prescriptions, and early refills. Investigators met with Dr. BROWN to review the medical records of some of these patients. It was found that one of these patients had been drug tested in Dr. BROWN's office and was found to be positive for street drugs but negative for the Benzodiazepine prescribed by Dr. BROWN. Dr. BROWN failed to address either issue and continued to prescribe Morphine, Vicodin, and Xanax to the patient. Based on training and experience, your declarant knows that opioid/pill dealers will test negative for prescribed pills because these pills are sold or otherwise illegally distributed on the street and not administered to the "patient." In addition, your declarant knows that doctors will avoid or ignore certain procedures and test results for the purpose of consummating a sale or charging a fee to a patient.

21.     Dr. Brown's patient charts also revealed that many of the patients had very old or no diagnostic tests (i.e. X-ray, MRI, CT scan, etc.) to aid in the proper diagnosis and treatment of their pain. Investigators brought to Dr. BROWN's attention that some of these patients were seeing other doctors to obtain prescriptions and using multiple pharmacies to hide the fact that they were getting multiple prescriptions and early refills. Based on training and experience, your declarant knows that opioid/pill street dealers will "doctor shop" in order to obtain more pills or inventory for the purpose of illegally selling or otherwise distributing the pills on the street.

22.     Pharmacies have a "corresponding responsibility" not to fill suspicious

8

prescriptions. Wholesale distributors have the same "corresponding responsibility" not to sell controlled substances/opioids to suspicious pharmacies. This investigation has revealed that 4 out of 5 of the large wholesale pharmaceutical distributors discontinued all controlled substance sales to the DAYTON PHARMACY to include H.D. Smith, Harvard Drug, Anda Pharmaceutical, and McKesson Corporation. For example, during 2012, H.D. Smith wholesale distributors conducted a "Compliance Profile Summary" Investigation of Dr. BROWN and the DAYTON PHARMACY based on excessively large purchases of Oxycodone made by DAYTON PHARMACY. The summary stipulated, in part, that Dr. BROWN is the highest prescriber of controlled substances at the DAYTON PHARMACY and responsible for 77% of all controlled substances filled. Details of this compliance profile indicate DAYTON PHARMACY is a high risk potential to H.D. Smith. It was recommended to block all controlled substances to DAYTON PHARMACY; therefore, H.D. Smith discontinued all controlled substance sales to DAYTON PHARMACY.

23. During 2013, investigators from the State Medical Board of Ohio conducted another investigation into the practices of Dr. BROWN. Dr. BROWN sent a letter to the medical board stating that after the investigator's visit to Dr. BROWN in 2010, he was unable to get his number of pain patients under the 51% mark as required by state pain clinic licensure law. About that same time, the investigator received information from Medicaid that Dr. BROWN was the number two prescriber of methadone and the number two prescriber overall for controlled substances in the state of Ohio. As part of the investigation, the medical board investigator met with an Agent from the State of Ohio Board of Pharmacy, who informed him that the pharmacy board currently was investigating DAYTON PHARMACY, and the pharmacy board investigator provided a report from May 2012, written by the compliance investigator with wholesale pharmaceutical company H.D. Smith, as mentioned above.

9

24.     In November 2013, investigators from the Ohio medical and pharmacy boards interviewed Dr. BROWN and his wife, Alison BROWN, in the unused physical therapy portion of the medical office. During the interview, Dr. BROWN admitted that he never applied for pain clinic licensure and currently was in violation of state law. Dr. BROWN stated that when he checked his numbers in October, 72% of his patients were receiving narcotics for chronic pain. Mrs. BROWN provided an electronic report detailing all patients seen from June 1, 2013, to August 31, 2013. Investigators conducted a random check of days in this time period and learned that over 80% of BROWN's patients received prescriptions for controlled substances. Mrs. BROWN also provided an electronic report detailing the controlled substances prescribed by Dr. BROWN; however, it did not match the data contained in the OARRS report for the same time period. Investigators determined that a majority of the patients brought to Dr. BROWN's attention during the 2010 investigation were still receiving large quantities of narcotics, some of them with overlapping prescriptions. Based on training and experience, your declarant knows that doctors and their medical staff will lie or make false statements in an attempt to conceal illegal activity or to avoid strict protocols or reporting requirements for the purpose of consummating a sale and/or charging a fee to a patient.

25.     In January 2015, DEA-Tactical Diversion Squad Investigators ran an OARRS report to examine the prescribing habits of Dr. BROWN. Many of Dr. BROWN's patients were still receiving large doses of both long-acting and fast-acting opioids along with Benzodiazepines and a sedative, all of which are commonly diverted drugs and are sold or otherwise illegally distributed on the street. Several of Dr. Brown's patients were given early refills which also is an indicator of diversion. Most of the patients receiving these combinations of drugs and early refills were supplied by the DAYTON PHARMACY. Investigators observed other "red flags" for

10

possible drug diversion during the examination. For example, several of the "patients" were traveling great distances, some over two hours, to see Dr. BROWN including patients from southern Ohio, northern Ohio, and Indiana. Also, multiple family members were receiving like or similar drugs during the same time period.

26.     Investigators presented a copy of Dr. BROWN's OARRS report for a two-year period from January 1, 2013, through December 30, 2014, to an expert for analysis as it relates to prescribing concerns and overall prescribing habits. The expert analysis concluded the following for a sample of patients:

> Large quantities of immediate release narcotics, controlled substances and/or opioids were prescribed to patients. In addition, other pills (Benzodiazepines) were prescribed as a "cocktail" that is both dangerous and consistent with diversion of prescription narcotics.

The expert also identified several issues that caused concern with Dr. BROWN's prescribing patterns and deemed them out of the standard of care for a primary care physician, as follows:

a.     Strikingly similar patterns of prescribing throughout the patients;

b.     Over 33,000 prescriptions during the two-year time period with an average of 66.5 opioids prescriptions per day;

c.     Many patients had high dosages of different types of opioids;

d.     The use of high dosage of potent opioids, especially with combination of Benzodiazepines, is dangerous and has no clinical value and raises concern of the prescribing activity;

e.     The high dosage of opioids and the combinations of opioids make it a concerning type of prescribing trend; and

f.     These combinations create a situation that will create an environment of, at the minimum, dependency or any addictive disorder which is not suitable for a primary care setting.

27.     Investigators ran an OARRS report on September 6, 2017, and found that a majority of the patients from this expert analysis continued to be prescribed the same or similar medication

by Dr. BROWN, except for three patients who had died while in the care of Dr. BROWN.

28.     Investigators interviewed several former employees of both Dr. BROWN's practice and the DAYTON PHARMACY. Through these interviews, investigators identified approximately nineteen patients who had died while receiving questionable prescriptions for controlled substances from Dr. BROWN. The medical terminology listed under cause of death is defined as follows: (a) Multidrug Intoxication is an overdose or reaction due to a combination of more than one drug; and (b) Myocardial Infarction is commonly referred to as a heart attack. Investigation revealed that in several cases, Dr. BROWN, a family care doctor, signed the death certificate, certifying the cause of death without an autopsy as Myocardial Infarction as compared with several cases when a medical examiner performed an autopsy, the cause of death was certified as Multidrug Intoxication.

29.     On August 29, 2016, Columbus DEA and pharmacy board investigators interviewed a "fill-in" pharmacist ("CS-2") at the DAYTON PHARMACY during 2016, and investigators gleaned the following.

      a.    In June 2016, CS-2 graduated from South University School of Pharmacy in Savannah, Georgia. In July 2016, CS-2 became registered with the State of Ohio Board of Pharmacy. While looking for a pharmacy position in the Dayton area, CS-2 delivered a resume to the DAYTON PHARMACY. Mahmoud ELMIARI, a.k.a. Mike, was the manager of the DAYTON PHARMACY and called CS-2 to offer him a position as a "fill-in" pharmacist.

      b.    CS-2 was uncomfortable with the prescribing habits of Dr. BROWN. In particular, CS-2 was concerned with the amount of controlled substance prescriptions written by Dr. BROWN and the percentage of patients who received controlled substance prescriptions. In addition, CS-2 was alarmed by the quantities of controlled substances; most patients were receiving more than one controlled substance and high dosage units. Dr. BROWN's patients consistently obtained prescription refills two or three days early. CS-2 also questioned the necessity or legitimate medical purpose for a number of prescriptions written for Dr. Brown's patients. CS-2 observed a pattern of Dr. BROWN's patients receiving multiple, short-acting opioids

along with Benzodiazepines.

c.  CS-2 stated that most of the prescriptions filled at the DAYTON PHARMACY came from Dr. Morris BROWN which constituted approximately 85% of the prescriptions filled. CS-2 was told by Mahmoud ELMIARI that Dr. BROWN's office would send over a list of the patients to be seen so that prescriptions could be pre-filled prior to the patient seeing Dr. BROWN. CS-2 found it alarming that Dr. BROWN was "funneling patients" to the DAYTON PHARMACY. CS-2 was offered a full time position at the DAYTON PHARMACY, but he declined and is no longer employed at the DAYTON PHARMACY.

30.  Investigators have corroborated the information provided by CS-2 regarding "patient funneling" by Dr. BROWN to the DAYTON PHARMACY. Investigation discovered that Dr. BROWN mailed letters to patients directing them to have their prescriptions filled at the DAYTON PHARMACY, and if patients failed to go to the DAYTON PHARMACY, Dr. BROWN would discontinue prescribing pills to the patients.

31.  Investigation revealed that wholesale distributor McKesson Corporation discontinued selling and distributing controlled substances to the DAYTON PHARMACY during February 2017, in part, because the owners provided false information on McKesson's "New Customer Application" in June 2012. On its application, the DAYTON PHARMACY did not disclose to McKesson that three other wholesale distributors, namely H.D. Smith, Harvard Drug, and Anda Pharmaceuticals, previously had discontinued selling controlled substances to the DAYTON PHARMACY. McKesson's application lists Ismail ABUHANIEH and Mahmoud ELMIARI (manager) as the authorized contact name and the alternate contact name, respectively. The application shows Fifth Third Bank Account Number xxxxxx0916, held in the name of HAYA LLC, DAYTON PHARMACY, as the account to be billed by McKesson for all future sales.

32.  After McKesson Corporation discontinued selling controlled substances to the DAYTON PHARMACY, Mahmoud RIFAI falsified a "New Customer Application" for a

wholesale pharmaceutical distributor named Amerisource Bergen in order to continue purchasing controlled substances. RIFAI stipulated that he is the "owner" of the DAYTON PHARMACY and provided false information about the total monthly dosage units of controlled substances and about the doctors for whom the pharmacy was filling prescriptions. RIFAI also failed to disclose that four other wholesale pharmaceutical distributors previously had discontinued selling pills to the DAYTON PHARMACY.

33.     Based on these fraudulent and deceptive applications, submitted by the DAYTON PHARMACY to McKesson Corporation and Amerisource Bergen, from June 2012, through at least November 2017, the DAYTON PHARMACY illegally obtained controlled substances/opioids and then distributed and dispensed these controlled substances/opioids to patients primarily "funneled" from Dr. BROWN's medical practice while ignoring its "corresponding responsibility" not to fill suspicious prescriptions and profiting from these illegal activities.

34.     On November 7, 2017, federal search warrants were served at Dr. BROWN's PRIMARY CARE DAYTON medical practice and at the DAYTON PHARMACY. At the time of the search, Dr. BROWN was not present; however, his wife and several employees were present. Dr. BROWN was contacted by investigators by telephone, but he refused to come to his business and told investigators that all of the employees were represented by legal counsel.

35.     At the time of the search at the DAYTON PHARMACY, a source of information ("CS-3") stated the following during an interview.

> a.     Approximately 91% of the prescriptions filled by the DAYTON PHARMACY were written by Dr. Morris BROWN.

> b.     Many of the prescriptions written by Dr. BROWN were excessive, such as a prescription for 240 methadone tablets.

14

  c.  CS-3 called the pharmacy "owner" to voice his concern, but Mahmoud M. RIFAI directed him to "make sure the pharmacists fill all of BROWN's prescriptions."

  d.  Ismail ABUHANIEH and Mahmoud RIFAI both own the DAYTON PHARMACY.

  e.  Wholesale distributors H.D. Smith, Harvard Drug, Anda Pharmaceuticals, and McKesson Corporation would no longer sell controlled substances to the DAYTON PHARMACY due to the excessively high amounts of opioids being sold.

  f.  The DAYTON PHARMACY deposits the money made from sales of controlled substances into Fifth Third Bank Account Number xxxxxx0916.

  g.  The DAYTON PHARMACY has a rental lease agreement with BROWN M D & ASSOCIATES LLC.

36.  Through subsequent investigation, including the development of multiple sources of information with firsthand knowledge of the activities by members of this group, investigators learned that Dr. Morris BROWN, the DAYTON PHARMACY, its owners and employees, BROWN M D & ASSOCIATES LLC, and others laundered controlled substance proceeds, that is, proceeds of specified unlawful activity, on behalf of this trafficking organization. Dr. BROWN and the DAYTON PHARMACY received proceeds from distributing and dispensing controlled substances/opioids and acquired, funded, and/or maintained property, including but not limited to, the real property located at 301 W. 1st Street, Dayton, Ohio 45402 and controlled substances/opioids from pharmaceutical companies, with the intent to promote the carrying on of the trafficking organization.

37.  Your declarant has reviewed bank records for Fifth Third Bank Account Number xxxxxx0916, held in the name of HAYA LLC, DAYTON PHARMACY. Ismail ABUHANIEH and Mahmoud RIFAI are the authorized signers on the account. The bank records indicate the following: (a) over a two-year period from November 2015, through October 2017, total deposits

were approximately $11.3 million dollars with average monthly deposits of approximately $474,000.00; (b) over this same two-year time period, several millions of dollars were paid to wholesale pharmaceutical companies McKesson Corporation and Amerisource Bergen; (c) specifically, payments were made through February 2017, to McKesson totaling approximately $6.7 million dollars until McKesson discontinued sales to DAYTON PHARMACY and then payments were made from February 2017, through October 2017 to Amerisource Bergen totaling approximately $2.5 million dollars; (d) on November 6, 2017, the account balance was $187,625.74; and (e) on the following day, which was the day of the search, $185,000.00 was wired out of the account.

38.    Regarding ownership of the DAYTON PHARMACY, investigation revealed the following: (a) the pharmacy license filed through the Ohio State Board of Pharmacy and the DEA Registration both show Mahmoud RIFAI as the "owner" of the DAYTON PHARMACY; (b) the Ohio Secretary of State lists the "owner" of the DAYTON PHARMACY as HAYA, LLC which is owned by Ismail ABUHANIEH; and (c) the Ohio Secretary of State "Authorized Representative" for both companies is listed and/or signed by Ismail ABUHANIEH with an address of 1449 Meadow Woods Court, Waynesville, Ohio 45068. Based on public database checks and investigation, it appears ABUHANIEH rents the residence in Waynesville, Ohio, and has a permanent residence in Phoenix, Arizona.

39.    Ismail Mohammed ABUHANIEH is a registered pharmacist in Ohio, Michigan, and Arizona, and he owns pharmacies in Ohio and in several other states under various LLCs. Investigators discovered the building that contained both Dr. BROWN's medical practice and the DAYTON PHARMACY is owned by BROWN M D & ASSOCIATES LLC, a real estate holding company, which lists Dr. BROWN and his wife, Alison BROWN, as the principal executives of

16

the LLC. The DAYTON PHARMACY had a pharmacy manager and pharmacist who handled the day-to-day operations. The pharmacy occupied approximately 200 square feet in the same building and directly across from Dr. BROWN's medical practice, located at 301 W. 1st Street, Dayton, Ohio 45402. Investigators learned that the DAYTON PHARMACY had a rental lease agreement with BROWN M D & ASSOCIATES LLC. Prior to October 2016, the DAYTON PHARMACY paid approximately $2,000 per month for rent or $24,000 annually. During approximately October 2016, through December 2017, the monthly rent for the DAYTON PHARMACY increased from $2,000 per month to $5,000 per month or $60,000 annually. This is a 150% increase in rental payments.

40. Based on training and experience, your declarant knows that proceeds derived from illegal activities, such as drug trafficking activities, can be laundered through quasi-legitimate businesses as income or sales and then disbursed as expenditures like rent, payroll, commissions, business loans, or any other financial statement line items and ultimately re-paid or "kicked-back" to co-conspirators.

41. For example, the $5,000 monthly rent paid to BROWN M D & ASSOCIATES LLC by the DAYTON PHARMACY is charged at an "inflated" rate. The DAYTON PHARMACY occupies approximately 200 square feet. Based on annual rent of $60,000, the DAYTON PHARMACY is paying approximately $300.00 per square foot as compared to an average of approximately $15.00 per square foot paid by other tenants that occupy the same building. A review of the Kettering Health Network Group's lease agreement shows annual rent of approximately $100,880 for 6,305 square feet, which is $16.00 per square foot. A review of Southwest Cardiology's lease agreement shows annual rent of approximately $21,600 for 1,559 square feet, which is approximately $13.86 per square foot.

42.     Your declarant also reviewed bank records for PNC Bank Checking Account Number xxxxxx3064, held in the name of BROWN M D & ASSOCIATES LLC.  The authorized signers on the account are Morris BROWN and Alison BROWN.  These records indicate that from approximately October 2016, through October 2017, deposits made for rent from the DAYTON PHARMACY totaled approximately $55,000, consisting of $5,000 monthly payments or aggregate amounts of $5,000 installments.  On November 6, 2017, the account balance was $15,756.16.

43.     Further review of bank records for the accounts indicates that checks were issued from Fifth Third Bank Account Number xxxxxx0916, held in the name of HAYA LLC, DAYTON PHARMACY, and such checks were then deposited into the PNC Bank Checking Account Number xxxxxx3064, held in the name of BROWN M D & ASSOCIATES LLC as follows:  (a) on December 29, 2016, there were corresponding financial transactions in the accounts in the amount of $15,000; (b) on January 11, 2016, there were corresponding financial transactions in the accounts in the amount of $60,000; (c) on April 18, 2017, there were corresponding financial transactions in the accounts in the amount of $5,000; (d) on May 8, 2017, there were corresponding financial transactions in the accounts in the amount of $5,000; (e) on June 6, 2017, there were corresponding financial transactions in the accounts in the amount of $5,000; (f) on July 19, 2017, there were corresponding financial transactions in the accounts in the amount of $5,000; (g) on August 2, 2017, there were corresponding financial transactions in the accounts in the amount of $5,000; (h) on September 7, 2017, there were corresponding financial transactions in the accounts in the amount of $5,000; and (i) on October 10, 2017, there were corresponding financial transactions in the accounts in the amount of $5,000.

44.     In addition to BROWN M D & ASSOCIATES LLC receiving regular rent

payments from other tenants and "inflated" rent from the DAYTON PHARMACY, further review of statements for PNC Bank Checking Account Number xxxxxx3064, held in the name of BROWN M D & ASSOCIATES LLC, shows monthly payments being disbursed to Wells Fargo Bank and Montgomery County Tax Bill, which appear to be payments for the building mortgage and real estate taxes. At a minimum, Dr. BROWN used the proceeds of specified unlawful activity, received in the form of rent from the DAYTON PHARMACY, to pay down the mortgage on the building, build equity, and maintain a premises used for distributing and dispensing controlled substances.

45.     Investigation revealed that in addition to Dr. BROWN owning and operating his medical practice DAYTON PRIMARY & URGENT CARE CENTER, Inc., d/b/a PRIMARY CARE DAYTON, he was employed by the Kettering Health Network Group. Subsequent to the execution of the search warrants, Dr. BROWN was fired from the Kettering Health Network Group on or about November 10, 2017.

46.     On December 11, 2017, the Ohio Board of Pharmacy received a notice from the DAYTON PHARMACY as to its intent to discontinue business as of December 29, 2017. This written notice of discontinuing business appears to be signed by "M. RIFAI" (Mahmoud RIFAI).

47.     In February 2018, Dr. BROWN surrendered his DEA Registration.

## CONCLUSION

48.     Based upon the foregoing, I assert that there is probable cause for the forfeiture of the $3,579.81 from Fifth Third Bank Account Number xxxxxx0916, held in the name of HAYA LLC, DAYTON PHARMACY; and for $3,976.61 from PNC Bank Checking Account Number xxxxxx3064, held in the name of BROWN M D & ASSOCIATES LLC, because such funds are subject to forfeiture to the United States under 21 U.S.C. § 881(a)(6) as property furnished or

19

intended to be furnished in exchange for a controlled substance, proceeds traceable to such an exchange, and property used or intended to be used to facilitate one or more violations of 21 U.S.C. §§ 841, 846, and 856; and under 18 U.S.C. § 981(a)(1)(A) as property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956, or property traceable to such property.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 6th day of November, 2018.

Michael P. Flynn
Special Agent
Drug Enforcement Administration

20